IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) | CASE NO.  CV 04-168-MHW |
| Plaintiff, | ) | |
| v. | ) | |
| JEFFREY FOSS, Supervisor, Snake River Office, USFWS; U.S. FISH AND WILDLIFE SERVICE, and GALE NORTON, Secretary of the Department of the Interior, | ) | **MEMORANDUM DECISION AND ORDER** |
| Defendants, | ) | |
| DICK KEMPTHORNE, OFFICE OF SPECIES CONSERVATION, and JAMES L. CASWELL, | ) | |
| Defendant-Intervenors | ) | |

## INTRODUCTION

Plaintiff, Western Watersheds Project ("Western Watersheds"), filed this action against

Jeffrey Foss, Supervisor of the Snake River Field Office of the United States Fish and Wildlife

Service, the United States Fish and Wildlife Service ("FWS"), and Gale Norton, the Secretary of

the Department of Interior, also collectively referred to as the "Federal Defendants," for

declaratory and injunctive relief.  The essence of the complaint is that the Secretary of Interior

and the FWS violated the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA") and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"), by withdrawing the proposed rule to list Slickspot Peppergrass (*Lepidium papillerum* or LEPA) as endangered under the ESA. Intervenor-Defendants are the Idaho Governor's Office of Species Conservation ("OSC"), Idaho Governor Dirk Kempthorne, and James L. Caswell, Administrator of OSC.  Jurisdiction is proper under 28 U.S.C. § § 2201-2201 and 5 U.S.C. § 701-06.  All parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c).

Western Watersheds Project is a non-profit membership organization dedicated to protecting and conserving the public lands and natural resources of watersheds.  Western Watersheds has over 1400 members, including members throughout Idaho.  Members of Western Watersheds live and/or recreate throughout the sage-steppe ecosystem, within the range of the slickspot peppergrass, deriving aesthetic, recreational, scientific, inspiration, educational and other benefits from slickspot peppergrass's existence in the sage-steppe.

The FWS, under the direction of the Secretary of Interior has been charged by the United States Congress with implementation of the provisions of the ESA and recommending terrestrial species for protection under the ESA.[1]  Western Watersheds challenges the decision by Federal Defendants to withdraw its proposed rule to list slickspot peppergrass (*Lepidium papillerum* or LEPA) as endangered, arguing the decision violated the ESA.  FWS justifies the withdrawal based on its conclusion that there is a lack of strong evidence of a negative population trend, and the conservation efforts contained in the Candidate Conservation Agreement ("CCA"), and other recently implemented resource management plans, provide the necessary certainty that the risk

---

[1]The National Marine Fisheries Service, under the Department of Commerce, has been tasked with the implementation of the ESA with respect to marine and andramous fish.

Order - Page 2

to the species has been reduced to a level below that of threatened or endangered.  The OSC played a key role in facilitating the State of Idaho's efforts to develop and implement the CCA that is challenged by Western Watersheds in the present action as being inadequate to protect the slickspot peppergrass.

Currently pending the Court for its consideration is Plaintiff's Motion for Summary Judgment, filed on November 8, 2004 (Docket No. 26), as well as Federal Defendants' Cross-Motion for Summary Judgment, filed on January 21, 2005 (Docket No. 40), and the Motion for Summary Judgment by Defendant-Intervenors Governor Dirk Kempthorne, *et al.*, filed on January 25, 2005 (Docket No. 48).  Subsequent to the hearing conducted on July 25, 2005, Federal Defendants filed a motion on July 28, 2005, asking the Court to strike the Second Declaration of Todd C. Tucci (Docket No. 74).

The Court did not consider any of the documents to the Tucci Declaration when making its decision.  Therefore, it finds the Federal Defendants' Motion to Strike is moot.  With respect to the cross-motions for summary judgment, for the reasons that follow, the Court finds the Secretary of Interior relied on improper standards when she determined that the listing of slickspot peppergrass under the ESA was not warranted.  Accordingly, the Court finds her decision to be arbitrary and capricious.

## I.
## Background

Congress enacted the Endangered Species Act to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species...." 16 U.S.C. § 1531(b).  A species receives the protections of the ESA when the FWS lists the species as

"endangered" or "threatened."  A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  Similarly, a species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

The FWS shall list a species as endangered or threatened because of any one or a combination of the following factors: A) the present or threatened destruction, modification, or curtailment of its habitat or range; B) overutilization for commercial, recreational, scientific, or educational purposes; C) disease or predation; D) the inadequacy of existing regulatory mechanisms; or E) other natural or manmade factors affecting its continued existence.  16 U.S.C. at § 1533(a)(1); 50 C.F.R. § 424.11(c).  The FWS shall make listing determinations "solely on the basis of the best scientific and commercial data available," without reference to the possible economic or other impacts of such a determination. 16 U.S.C. § 1533(b)(1)(A), 50 C.F.R. § 424.11(c).

Before the Secretary makes the final decision to list a species, she must issue a proposed rule recommending that species for ESA protection. 16 U.S.C. § 1533(b)(1)(A).  A period of public comment follows.  Within one year, the Secretary must either publish a final rule designating the species for protection or, if she finds "that available evidence does not justify the action," withdraw the proposed rule. 50 C.F.R. § 424.17(a)(iii); see also 16 U.S.C. § 1533(b)(6)(A).[2]

---

[2] The Secretary may also delay a final decision for up to six months because of "substantial disagreement" in the scientific community regarding the "sufficiency or accuracy of the available data relevant to the determination or revision concerned." 16 U.S.C. § 1533(b)(6)(B)(i).

**Order - Page 4**

**A. Slickspot Peppergrass** (*Lepidium papillerum*)**.**

Slickspot peppergrass is found in only one place in the World, in an area comprising approximately 20,000 acres in Southwestern Idaho.  It is an herbaceous flowering plant indigenous to the sage-steppe ecosystem, found growing at approximately 2,200 feet to 5,400 feet elevation on Idaho's Snake River Plain, Owyhee Plateau, and adjacent foothills in southwestern Idaho.  AR 30; AR 1079 (CCA).  The plant only grows in small depositional micro-sites similar to vernal pools ranging in size from one to ten square meters.  AR 30 (Proposed Rule).  Relatively high concentrations of clay and salt and reduced levels of organic matter and nutrients characterize these micro-sites.  It is a taprooted annual or biennial plan that reaches 4 to 12 inches in height, displaying two life-cycle types.  AR 1079.  The annual LEPA matures, reproduces by setting seed, and dies in one growing season, whereas the biennial LEPA initiates growth in the first year, and does not produce seed and die until the second year.  *Id.*  The plant holds an intricate branch pattern with "pubescent" leaves and stems (covered with fine, soft hairs), while numerous small, white 4-petalled flowers terminate the branches.  AR 1080.  This species produces small, spherical fruits.  *Id.*

Like many short-lived plants growing in arid environments, the above ground occurrences of individual slickspot peppergrass plants at a given site naturally fluctuates widely from one year to the next, depending primarily on seasonal precipitation patterns.  *Id.*  Above-ground plants represent only a portion of the population, with the seed bank (a reserve of dormant seeds, generally found in the soil) contributing to the remainder of the population, and apparently the majority of the population, in many years.  *Id.*  The number and location of observable plants in a population varies annually due to a number of factors, including the

amount and timing of rainfall, temperature, soil conditions, and the extent and nature of the seed bank.  *Id.*  Therefore, estimates of above-ground plants do no reflect the actual population levels because the majority of the population exists in the seed bank.  *Id.*  Maintenance of a seed bank is important for year-to-year and long-term survival of plant species, especially annual plants, which inhabit environments with variable and unpredictable annual precipitation.  *Id.*

Occurrences[3] of slickspot peppergrass are comprised of one to several slickspot micro-sites documented to contain the plant.  *Id.* at 1083.  A slickspot area identified as an occurrence, contains slickspots known to be occupied by slickspot peppergrass interspersed within a matrix of unoccupied sagebrush-steppe habitat.  *Id.*  Thus, an occurrence includes slickspot habitat directly occupied by slickspot peppergrass, as well as surrounding landscape, which is not occupied by slickspot peppergrass, resulting, in most cases, in only a small fraction of an occurrence acreage being directly occupied by slickspot peppergrass.  *Id.*

The total estimated area of extant occurrences as of February 2003 was approximately 20,500 acres (8,300 hectares).  Of the estimated total of occurrences, approximately 91 percent (18,655 acres/7,550 hectares) occurred on federal land; 3 percent (615 acres/249 hectares) occurred on private land; and 6 percent (1,230 acres/498) occurred on state land.  The largest occurrence–constituting 44 percent of the total slickspot peppergrass occurrence acreage– is located on the Air Force's Juniper Butte Range.  *Id*

The Idaho Conservation Data Center ("ICDC") database contains a total of 93 LEPA occurrences.  Of this total, 75 are extant, 5 are historical, and 13 are considered extirpated.  Historical collections are based on collections occurring throughout the previous century, but

---

[3]An "occurrence" (or "element occurrence") as defined by the Idaho Conservation Data Center represents a specific geographic location containing a species (or some other element) of conservation concern.

which have not been relocated in recent years, while occurrences are considered extirpated if the native vegetation has been converted to cropland, or other urban or commercial uses.  Unlike historical occurrences, the extirpated occurrences are never expected to return.  The 75 extant occurrences may be depicted as point (small occurrences comprised of only one or a few clustered occupied slickspots); a single polygon (occurrences comprised of occupied slickspots scattered over a more or less contiguous area; or of multiple polygons (occurrences comprised of two or more discrete areas having occupied slickspots).  AR 3096 (Withdrawal of Proposed Rule).

60 of the 75 extant occurrences have been ranked by ICDC using a rating system of "A" through "D".   An "A" rating represents sites with the greatest number of above-ground plants, best quality habitat, and highest probability of long-term survivability.  AR 1084 (CCA).  The lowest ranking is "D", which consist of generally less than 50 individuals (often less than 25) occurring as isolated populations in degraded habitats.  AR 3097 (Withdrawal of Proposed Rule).  Of the 60 ranked occurrences, 12 percent (7) are considered A-quality, while 15 percent (9) are considered B-quality, and 35 percent (21) are considered C-quality.  Another 30 percent (18) are considered D-quality and are not expected remain viable.  AR 1085 (CCA).  The remaining 8 percent have been categorized as intermediate between either "B/C" or "D" ranked.

The long term future of LEPA is of concern given existing risks and current management because the sagebrush steppe ecosystem is undergoing a massive conversion from predominantly native vegetation with infrequent wildfires to one that is dominated by grasses (especially cheat grass, a non-native annual) and increased fire frequency.  AR 1789 (Finding by Science Panel). A variety of other activities also threaten slickspot peppergrass.  Some of these activities include

cattle and sheep grazing, road development, gravel mining, and construction activities associated with expansion of military training facilities, off-road vehicles, irrigated agriculture, fire and fire rehabilitation activities; and urbanization.  AR 1084.  Slickspot peppergrass is extremely sensitive to changes in habitat conditions, making it more vulnerable to human activities or human-caused habitat modifications that affect its habitat, such as poor land management practices.  AR 2 (Withdrawal Notice); AR 31-35 (Proposed Rule).

**B. Listing History.**

In 1990, the FWS designated slickspot peppergrass as a category 2 candidate species, indicating that listing as threatened or endangered under the ESA may be appropriate, but insufficient data was available to support a listing.  AR 5 (A1).  In 1996, the FWS eliminated candidate species designations, but began using the designations again in 1999, at which time, slickspot peppergrass was reinstated as a candidate species.  Again, in 2000, the FWS prepared a listing package for slickspot peppergrass.  In the draft proposed rule, the FWS concluded, "[w]e have carefully assessed the best scientific and commercial information available regarding past, present, and future threats faced by [slickspot peppergrass] in determining to issue this proposed rule, ... [and] [b]ased on our evaluation, the preferred action is to list [slickspot peppergrass] as endangered."  AR 15841-903 (2000 Proposed Rule with Critical Habitat Designation).

The FWS asserts it halted the process as a result of funding shortfalls, but Western Watersheds maintains the FWS halted the process because of political pressure. AR 15764-5.  After circulating an internal memorandum titled "[Senator] opposes proposal to list [slickspot peppergrass]" (AR 16720), and despite having drafted the proposed rule and after completing an

Outreach Plan, the FWS opted not to publish the proposed rule to list slickspot peppergrass as endangered.

Subsequent to the FWS's decision to halt the listing process, Western Watersheds and others sought to compel the FWS to list slickspot peppergrass under the procedures outlined in Section 4 of the ESA by submitting a Listing Petition. AR 18513-783. The FWS rejected the Listing Petition on the grounds that listing of slickspot peppergrass was "warranted but precluded" pursuant to 16 U.S.C. § 1533(b)(3)(B)(iii) because of other species with a higher listing priority. *Answer*, ¶ 30 (Docket No. 6).

In November 2001, Western Watersheds and another group sued the FWS in the District of Oregon for violations of the ESA, by both (1) failing to respond adequately to Plaintiffs' Listing Petition, and (2) failing to protect slickspot peppergrass under the requirements of the ESA. *Complaint, Committee for Idaho's High Desert et al. v. Badgley,* No. 01-1641-AS (D. Or.); AR 5. This suit resulted in a settlement agreement whereby the FWS agreed to submit for publication a listing proposal for slickspot peppergrass by July 15, 2002 and to make a final listing determination by July 15, 2003. AR 6. Before the FWS published the proposed rule, it was contacted by the Air Force (AR 19452-3), interested ranchers (AR 19507), and members of Congress (AR 19600), who expressed concerns about listing LEPA under the ESA. Despite these concerns, but in accordance with the settlement agreement, the FWS published a proposed rule to list slickspot peppergrass as endangered on July 15, 2002. AR 29-28.

In developing the proposed rule, the FWS noted that livestock grazing and trampling, wildfire, invasion of exotic weeds, and off-road vehicle use continue to threaten all remaining habitat and populations of slickspot peppergrass. AR 29-38 (Proposed Rule). Due to the

proliferation of non-native grasses, such as cheatgrass, the fire frequency has been shortened from 60-110 years to less than 5 years, further endangering the survival of slickspot habitat.  AR 29 (Proposed Rule).   The FWS also identified heightened threats from the increase in organic debris (i.e., livestock feces) resulting from livestock grazing across slickspot peppergrass habitat. AR 32 (Proposed Rule).  The FWS observed that when organic matter increases, the incidence of nonnative species also increases, leading to a loss in suitable habitat.  *Id.*   Given all of these threats to the actual slickspot peppergrass population and its habitat, the FWS concluded that slickspot peppergrass was in danger of becoming extinct throughout all or a significant portion of its range.  AR 29-38 (Proposed Rule).

Upon publication of the Proposed Rule, the FWS invited public comment from all interested parties and solicited additional data and information to assist it in reaching a final decision. AR 29 (Proposed Rule).  In addition, the FWS requested peer review on the proposed rule from twelve independent scientists and received six responses.  AR 25.  One did so as part of the official comments of the U.S. Air Force ("Air Force").   Five peer reviews supported the sufficiency and accuracy of the data underlying the proposed rule, the Air Force did not. AR 25. Aside from the Air Force, among the experts who responded were Stephen J. Novak, Ph.D., an Associate Professor in the Department of Biology at Boise State University; Dr. Jayne Belnap, Ph.D., a Research Ecologist with the U.S. Department of the Interior; Dr. Susan Meyer, Ph.D., Research Ecologist with the U.S. Forest Service; Dr. James Smith, Ph.D., Biology Professor at Boise State University; and Steve Popovich, MS, Botanist with the Arapaho-Roosevelt National Forest–all of whom supported listing slickspot peppergrass as endangered or threatened.  AR 20687-89; AR 20801-3; AR 21355-57; AR 20507; AR 21358-59.

After reviewing the proposed rule, Dr. Novak concluded that "the scientific evidence is overwhelming for listing [slickspot peppergrass] as an endangered species," AR 20687-89, while Dr. Belnap wrote, "it is imperative that the few remaining plant populations be as protected as possible, as soon as possible, to protect their genetic material." AR 20801-3. Like Dr. Novak, Dr. Belnap "strongly support[s] the listing of this plant." *Id.*

In addition, Dr. Meyer expressed her support for listing the plant, stating, "I don't think that there is any doubt that this species meets the criteria for listing as endangered under the Endangered Species Act." Dr. Meyer began her response complimenting the FWS on "a well-prepared and compelling proposed rule." She further noted that, despite a few minor inaccuracies, "the documentation for this listing proposal is among the best I have seen." *Id.* at 21355. Specifically, she praised the accuracy of the monitoring methodology as "the absence of the plants does not necessarily signal the demise of a population, and the Habitat Integrity Index takes this fact into account...Its consistent application, along with count data, over a period of several years, has clearly demonstrated the process of population decline" creating "a very compelling argument for listing." *Id.*

The final two experts, Dr. Smith and Mr. Popovich, also concluded that listing the plant would be consistent with best available scientific data, indicating that the slickspot peppergrass is in danger of extinction in immediate and foreseeable future. AR 21355; AR 20507; AR 21358-59.

Based on its own assessment and the conclusions of the scientists who submitted comments, the FWS proceeded to draft the final rule to list slickspot peppergrass as endangered. However, due to strong resistance from a variety of different sources who opposed listing the

plant as endangered, the Regional Office of the FWS decided to re-write the draft of the final rule, dropping the designation down from endangered to threatened based on the perception of FWS staff that a greater chance existed to have it listed as threatened.  AR 22613 ("Biological Basis + Political Basis for T[hreatened] v. E[ndangered]...T[hreatened] might be O.K."); AR 22622-23.  On March 14, 2003, the Snake River Basis Office of the U.S. Fish and Wildlife Service transmitted to the Regional Office a Draft Final Rule to List Slickspot Peppergrass as Threatened.  AR 22262, 22267-368, 35551.  On July 1, 2003, the Director of the FWS approved the Final Rule to List Slickspot Peppergrass as Threatened.  AR 25341, 35551.

During this period of time, while the FWS continued to work on drafts of the final rule, the Air Force filed a challenge with the FWS in late March, 2003, alleging the proposed rule violated the Information Quality Act.  AR 22615-22621.  The Air Force argued that the FWS did not have sufficient scientific evidence to support a listing determination; the habitat integrity index (used in assessing and monitoring occupied habitat) required peer review prior to use in a listing determination; further investigation was needed to resolve taxonomic disagreements; the proposed rule presented the listing determination in an inaccurate, confusing, and misleading manner; and there were insufficient population surveys to determine whether there was a population decline.  *Id.* at 22619.

Based on the Air Force's comments, the Secretary determined that sufficient questions had been raised as to the accuracy of the data and science relied upon in writing the proposed rule, and a six-month extension for the final listing determination for slickspot peppergrass was published. AR 24-26.  During this six-month extension period, FWS planned to solicit additional data, refine its analysis of existing data, work on a conservation agreement for slickspot peppergrass with the State of Idaho and other interested parties, and assist the Air Force in

updating its Integrated Natural Resource Management Plan (INRMP), which establishes

standard operating procedures for managing significant natural resources at Air Force

installations.  *Id.* at 26; AR 3100.

At the conclusion of the six-month extension period, FWS published a notice on January

22, 2004, withdrawing the proposed rule to list slickspot peppergrass as an endangered species.

AR 1-23 (Withdrawal Notice).  FWS reached this conclusion, in large part, relying upon its new

"Policy for Evaluation of Conservation Efforts When Making Listing Decision " (PECE), which

it used to assess conservation measures to be undertaken pursuant to the "Candidate

Conservation Agreement" developed during the six-month period, as well as the Air Force's

newly revised INRMP.  68 Fed.Reg. 15100-15 (2003).

**C. PECE Policy**.

FWS had just recently announced the PECE policy on March 28, 2003, after FWS

proposed to list slickspot peppergrass, but before the six-month extension was granted.  *Id.*

FWS developed the policy "to ensure consistent and adequate evaluation of formalized

conservation efforts...when making listing decisions under the [Endangered Species] Act."  68

Fed.Reg. 15112.  "The policy applies to those formalized conservation efforts that have not yet

been implemented or have been implemented, but have not yet demonstrated whether they are

effective at the time of the listing decision."  68 Fed.Reg. 15113.

PECE identifies two main criteria that must be met before conservation efforts may be

given weight in a listing determination: (1) the certainty that the efforts will be implemented, and

(2) the certainty that the conservation efforts will be effective.  *Id.* at 15113.  In order to

demonstrate that a conservation effort will be implemented and will be effective, the agreement

must meet certain, very specific criteria outlined in the PECE.  *Id.* 15114-15.

**Order - Page 13**

If the FWS determines not to list a species based in part on such conservation efforts, the FWS will track the effort and reevaluate the status of the species if the parties fail to implement the conservation effort in accordance with the implementation schedule, fail to achieve objectives, or fail to modify the conservation effort to adequately address changes in threats to the species. *Id.* at 15114.  In addition, the FWS will reevaluate the species if new information indicates a possible change in status. *Id.*

**D. Formalized Conservation Efforts.**

After the FWS evaluated the CCA and the Air Force's newly revised INRMP under the PECE policy to determine whether could be considered during the listing process, the FWS concluded that the Air Force's INRMP and the CCA met the PECE policy criteria.  Therefore, the FWS took both conservation efforts into account when making its decision whether to list slickspot peppergrass under the ESA.

**1. U.S. Air Force Integrated Natural Resource Management Plan**

While the Air Force only stipulated to various voluntarily conservation measures in the CCA, the Air Force also collaborated with the FWS to revise the INRMP for Mountain Home Air Force Base, which includes the Juniper Butter Training Range.  AR at 3,6.  The INRMP adopts conservation measures, which are mandatory for all Air Force and contractor personnel and funded by the Air Combat Command through FY 2011.

The Air Force did not sign the revised INRMP until January 14, 2004–after the FWS had already made its decision to withdraw the proposed rule.  AR 3093.  Yet, the FWS asserts it reviewed the draft INRMP as early as September 25, 2003, and provided detailed comments on the conservation measures affecting slickspot peppergrass while explicitly referring to the PECE criteria.  AR 28965-70.  In addition, on January 9, 2004,  the Air Force sent a letter to the FWS,

further elaborating and clarifying some of its INRMP provisions.  AR 4184-90.  The FWS did

take this INRMP into account when making its listing determination.  AR 3093.

### 2. Idaho Army National Guard (IDARNG) INRMP

The IDARNG also recently revised its INRMP for Gowen Field/Orchard Training Area,

which includes 67% (4,430 acres) of the total acreage of all known high quality slickspot

peppergrass occurrences.  AR 4,6.  It was not finalized until after the FWS made its listing

determination and the FWS did not take into account when determining the status of the species.

AR 20.  Measures already implemented under the unrevised version were included, as well as

the commitments IDARNG made in the CCA.  *Id.*

### 3. Candidate Conservation Agreement

As noted above, the FWS supervised the development of a Candidate Conservation

Agreement in response to initial efforts by the State of Idaho, through the Office of Species

Conservation, to draft a conservation agreement that sought to conserve slickspot peppergrass

with the participation of private landowners, and others, so as to preclude the need for listing the

species under the ESA.  AR 24805-39.  Prior to the FWS's publication of the six-month

extension, the State of Idaho submitted to the FWS, in late June 2003, a draft of these early

efforts to work cooperatively to conserve the slickspot peppergrass outside the mandate of the

ESA.

Impressed with the preliminary effort, the FWS decided to participate in the formation of

a Steering Committee to guide the development of the CCA for slickspot peppergrass in

July/August 2003.  AR 26372; AR 28753; AR 29089.   The Steering Committee only included

those parties that would be involved in implementing the CCA–the U.S. Bureau of Land

Management (BLM), Office of Species Conservation (OSC), Idaho Department of Fish and

Game, Idaho Department of Lands, the Idaho Army National Guard (IDARNG), and ranchers. The FWS served in an advisory role as to policy, and the draft discussions were not open to the public.  *Id.*

The FWS invited Western Watersheds to participate in the development of the CCA at the outset.  AR 27268.  However, John Marvel, a member of Western Watersheds, advised the FWS that he did not find the first draft of the conservation agreement, developed in conjunction with the ranchers, to be acceptable and he did not view the drafting of a CCA to be a productive effort.  *Id.*  Mr. Marvel expressed his belief that the CCA process was being done to subvert the ESA and the listing requirements.  *Id.*  Given his feelings with respect to this conservation effort, Mr. Marvel did not wish to participate in drafting the agreement. *Id.*  Subsequently, Western Watersheds attempted to join the Steering Committee numerous times, but the FWS informed it on each occasion that the process had progressed to a point where it would not be feasible to bring in new parties, but it invited Western Watersheds to participate in the public comment after the draft was completed.  AR 27991; AR 29089.

Throughout the development of the CCA, the FWS provided its technical expertise on slickspot peppergrass and threats to the species, as well as specific guidance on the incorporation of the PECE criteria into the CCA.  *See, e.g.,* AR 27341; AR 27504; AR 29706; AR 29714; AR 30607-08; AR 31012-15.  At the same time, the FWS took the position that, while it would work collaboratively with the Steering Committee in addressing PECE criteria, it could not guarantee either that the final conservation efforts would satisfy PECE or that the conservation efforts, if they satisfy PECE, would result in a determination not to list slickspot peppergrass.  *See, e.g.,* AR 27504; AR 27806; AR 32174.  In developing the conservation measures, the Steering

Committee created a PECE checklist in an attempt to ensure that the document would meet the criteria.  *Id;* AR 29237-40.

At the conclusion of the drafting process, the Committee provided a draft copy of the CCA to the FWS on October 27, 2003 for formal review.  On October 30, 2003, FWS published in the Federal Register, a notice announcing the availability of the draft CCA for public review. AR 31307; AR 27-28.  As noted above, many of the Steering Committee participants hoped the development of the CCA would preclude the need for the listing of slickspot peppergrass under the ESA.  Yet, when the Committee issued a draft conservation agreement and opened the forum for public comment, many experts expressed their reservations regarding the CCA's efficacy and likelihood of implementation.

Some of the comments focused just on the potential efficacy of the CCA.  For example, Barbara Heslin, Biologist with the FWS's Field Office, stated that "[s]everal of the threats [to slickspot peppergrass] do not appear to be addressed within the Conservation Measures listed in the [CCA]."  AR 31690-95.  Heslin further commented that the CCA "does not include any Conservation Measures specific to livestock grazing" across the vast areas containing slickspot peppergrass habitat.  *Id.* at 31692.  Dr. Mark Miller, a Research Ecologist, also commented on the inadequacy of the draft CCA to address the threat posed by livestock trampling and recommended that greater consideration be given to minimizing all levels of soil-surface disturbance.  AR 32688-89.

Other commentators focused their main criticisms on the likelihood, or lack thereof, that the CCA would be implemented.  Dennis Mackey of the Snake River Basin Office of the Fish and Wildlife Service found the draft  "flawed in three general respects," including (1) lack of certainty of implementation of the conservation measures on public lands, (2) lack of certainty of

implementation on private lands, and (3) lack of credible information that funds will be available to implement the requirements of the agreement. AR 31872-76.  In addition, Dr. Ian Robertson of Boise State University submitted comments on the potential effectiveness of the draft agreement, noting, "[i]n theory, the [draft CCA] represents a reasonable management plan for slickspot peppergrass....However, I have concerns regarding the feasibility and implementation of the agreement, as well as how the effectiveness of the [CCA] will be evaluated.  AR 32297.

 Dr. Jayne Belnap, Ph.D., a Research Ecologist with the U.S. Department of the Interior, criticized the CCA for failing to provide certainty that the species would be protected based on her belief that the CCA was both substantively flawed in terms of the efficacy of its protective measures, and procedurally flawed in terms of the CCA's internal mechanisms for ensuring its implementation.  AR 32264-32265.  She stated, "All triggers are not defined, much of the agreement is voluntary and thus not truly enforceable, grazing levels and timing are vague and not defined, [and] surveys are to be done by unqualified personnel." AR 32265.  Other scientists expressed similar concerns.  AR 32359-61; AR 32370-74.

In finalizing the CCA, however, the Steering Committee considered the comments it received from both the public and the FWS.  AR 32914-22; AR 32938-39.  The FWS further asserts that it tracked whether the finalized CCA responded to these concerns.  AR 32816-16; AR 32820-33; AR 33242-57.  On December 11, 2003, the finalized and executed CCA was delivered to the FWS.  AR 1066-1263; AR 33323.

The CCA contains over 200 individual conservation efforts for slickspot peppergrass and applies to federal (BLM) and some state lands in Ada, Canyon, Elmore, Gem, Payette, and Owyhee counties in southwestern Idaho.  AR 1089-90, 1093-1128, 1137-80.  The CCA's express goal is to "conserve [slickspot peppergrass] and its habitat while protecting the long-term

sustainability of predictable levels of land use in southern Idaho." *Id.* at 1091.  The CCA

establishes three types of conservation areas for slickspot peppergrass, each with increasing

levels of conservation measures.  *Id.* at 1091.

The CCA also established mechanisms for protecting 17,045 acres of private lands,

which are incorporated into the CCA through memoranda of agreements (MOAs) between

private landowners and the OSC.  *Id.* at 1228-63.  The MOAs last for only one year with the

possibility of renewal.  *Id.*  In addition, the landowners have voluntarily agreed to conduct

monitoring and surveys, place salt, feed supplements, and water so as to minimize livestock

trampling of slickspot peppergrass; refrain from trailing livestock through slickspots during wet

seasons; and avoid slickspot disturbances during firefighting efforts.  *See, e.g., id.* at 1229-30.[4]

The MOAs contain no enforcement clause.  *Id.*

Western Watersheds criticizes the CCA as a poor substitute for listing slickspot

peppergrass as endangered or threatened because it alleges that the CCA proposes to protect

slickspot peppergrass plants and habitat by relying on untested and unproven conservation

measures.  AR 33398-41.  Western Watersheds notes that the CCA states that the conservation

measures for wildfire, off-road vehicles, and livestock trampling will only be "reasonabl[y]

certain[]" to positively impact slickspot peppergrass conservation.  AR 33389-93.  The FWS also

admits that the conservation measures only "may" reduce the threats to slickspot peppergrass

resulting from invasive, nonnative plants because of the difficulty in assessing the effectiveness

of conservation measures [relating to off-road vehicles].  AR 33392-93; AR 34168.

Furthermore, Western Watersheds asserts that the CCA only relies on voluntary conservation for

---

[4]Defendants assert that the FWS explicitly did not consider measures on private lands when analyzing the
status of the species and making its listing determination because of their voluntary nature and their consequent
uncertainty of implementation.  AR 15,16

the entire Juniper Butte Management Area, where the largest occurrence of slickspot peppergrass exists.  AR 33388-89.

**F. The Science Panel**

After the draft of the CCA was published for public comment, the FWS convened a blue ribbon panel of scientists with specialized knowledge to assess the relative importance of threats to slickspot peppergrass, and estimate the risk of extinction for the species ("Science Panel").  AR 32317-19 (Briefing Statement for Ass't Regional Director; AR 31548-49 (Science Review Team Charter).  The Science Panel met on November 5 and 6, 2003, and the FWS asked the Science Panel to evaluate the extinction risk to slickspot peppergrass under two management scenarios–status quo management and full and complete implementation of the conservation measures in the CCA.  AR 32318.  The FWS instructed the scientists that they each had 100 chips ("outcomes") that they could distribute among eight different time periods to represent extinction risk.  AR 34768; AR 32024.  These time periods were from the present to 10 years into the future; 11-20 years; 21-40 years; 41-60 years; 61-80 years; 81-100 years; 101-200 years; and over 200 years into the future.  AR 34768; AR 32024.  The FWS asked each scientist to estimate in which of these time periods slickspot peppergrass was most likely to go extinct under the two scenarios.  AR 34768.  Each scientist was also asked to imagine that the scenario occurred 100 times, one for each of their chips.  *Id.*  They were then asked to distribute their 100 chips among the time frames, permitting the scientists to include in their assessments of extinction risk uncertainty about the future.  *Id.*  Because there were six scientists, each with 100 chips, there were a total of 600 possible outcomes.

Under the status quo, most of the chips fell within the 21-100 year time frame.  Thus, most of the scientists considered that slickspot peppergrass had the highest chance of becoming

extinct in those time frames under current management.  AR at 34770.  Under current

management, between now and 80 years, there was a 66 percent chance of the plant becoming

extinct, or if stretched to 100 years, an 82 percent chance that it would become extinct during

that time.

Under the hypothetical management scenario described in the CCA and the United

States Air Force Integrated Natural Resource Management Plan, the scientists' assessment of

the extinction risk shifted further into the future.  Specifically, the Science Panel concluded that

with full implementation of the CCA and the Air Force INRMP, there was a 40 percent chance

the plant would become extinct in 80 years, and again if stretched out to 100 years, a 64 percent

chance of extinction.  AR 34770-71, 34780.

One expert biologist interpreted the Science Panel's conclusion concerning extinction of

risk to mean that "[t]he bottom line that you all need to be aware of (based on my observations

of the science panel) is that the species has a high risk of extinction regardless of the [CCA]

because of the systematic problems in the sagebrush steppe habitat and because the [CCA] does

little to reverse or attempt to reverse that trend."  AR 32730.  However, Jeff Foss, FWS

Supervisor, disagreed, stating that his observations of the Science Panel effort was that the CCA

had a discernable effect in pushing the danger of extinction risk into the future decades.  AR

32729.  Mr. Foss welcomed the biologist's comments, and further noted that it was important

that the Science Panel members, as well as the FWS managers, have a consistent interpretation

and representation of the Science Panel effort.  *Id.*

The FWS did not ask the Science Panel to draw conclusions on extinction risks absent

full and complete implementation of the CCA.  AR 32163-68.  Some scientists were

uncomfortable with this.  AR 32370-74 (Comments by expert scientist Debolt) ("I was deeply

disturbed when the [CCA] entered into the panel's discussion exercises on the second day and

we were permitted to rate the [CCA's] effectiveness in prevention extinction only under the

assumption that it would be fully implemented...I am 100% certain that 99% of the conservation

measures in the [CCA] will never be implemented.  Thus was the consensus of at least five of

the six science panel members in outside discussions, but apparently [the FWS's] managers did

not want this on the record").  Nor did the FWS ask the Science Panel whether slickspot

peppergrass met the statutory definition of an endangered or threatened species under the ESA

(i.e., "risk management " in the FWS terms).  AR 30793; AR 32163; AR 31548-49; AR 34772-

73.  Instead, the FWS decided that this determination would be the responsibility of the FWS

decision makers. *Id.*

      During the risk management phase, the FWS did not use formal quantitative thresholds

to evaluate the available data on slickspot peppergrass.  AR 34773.  Instead, it relied on more

general and qualitative methods. *Id.*  The FWS determined that slickspot peppergrass would not

likely become extinct under current conditions until 40 or more years into the future.  AR

34774.  With the conservation measures, as embodied in the CCA and INRMP, the FWS further

concluded that slickspot peppergrass would not likely become extinct until 60 or more years

into the future. *Id.*  The FWS ultimately concluded that conservation efforts postponed beyond

the foreseeable future the projected time when slickspot peppergrass has a high risk of

extinction, and, thus, that slickspot peppergrass is not likely to be in danger of extinction in the

foreseeable future. *Id.*

### G. Withdrawal of Proposed Rule

      At the conclusion of the six-month extension period, the FWS published a notice on

January 22, 2004 withdrawing the proposed rule to list slickspot peppergrass as an endangered

species.   AR 1-23 (Withdrawal of Proposed Rule).  The FWS based the withdrawal on two

grounds.  First, there was insufficient evidence to indicate a negative population trend.  Second,

there was sufficient certainty that the conservation measures described in the conservation

agreements would in fact be implemented.  Based on these conclusions, the FWS determined

that the risk to the species would be reduced to a level below the statutory definition of

endangered or threatened. *Id.* at 1.

The FWS discussed the required five-factor analysis that the FWS must consider in any

listing decision.  The FWS identified six threats to slickspot peppergrass–namely, wildfire,

livestock grazing management, military training activities, residential and agricultural

development, gravel or cinder mining, and recreational use.  AR 13-18.  The FWS concluded

that the CCA and INRMP reduced these threats such that slickspot peppergrass  no longer

required ESA protection.  AR 23.

## II.
## Standard of review.

Action agency consultations and the resulting issuances of biological opinions constitute

final agency action under 16 U.S.C. § 1536 and are subject to judicial review.  Because the ESA

has no specific provision for judicial review of final agency actions, the scope of review is

governed by the APA, 5 U.S.C. § 701 et seq.

Under the APA, an agency action must be upheld unless it is found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830-31 (9th Cir. 1986).  To decide if an

agency action is arbitrary and capricious, the court must determine whether the agency

considered the relevant factors and articulated a rational connection between the facts found and

the choices made. *Pacific Coast Federation of Fishermen's Ass'n, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001).  As long as the agency decision was based on the relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). See also *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987).

Judicial review under this standard is to be "searching and careful," but remains "narrow," and a court should not substitute its judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).  An agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving ... scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989), cert. denied, 498 U.S. 817 (1990).  Nevertheless, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned." *Greenpeace v. NMFS*, 80 F.Supp.2d 1137, 1147 (W.D.Wash. 2000).

When an agency's interpretation of a regulation conflicts with its earlier interpretation, the new position is "entitled to considerably less deference" than a consistently-held agency view. *Immigration and Naturalization Service v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987), citing *Watt v. Alaska*, 451 U.S. 259, 273 (1981).  In such a case, "[t]he agency will be required to show not only that its new policy is reasonable, but also to provide a reasonable rationale

supporting its departure from prior practice." *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d

1335, 1345 (9th Cir. 1990).  "Although the consistency of an agency's interpretation is one

relevant factor in judging its reasonableness, an agency's interpretation ... is nevertheless

entitled to deference, so long as the agency acknowledges and explains the departure from its

prior views." *Id.* (emphasis in original).

**III.**
**Discussion**

Western Watersheds sets forth a myriad of arguments to demonstrate that the FWS's

decision to withdraw its proposed rule to list slickspot peppergrass as an endangered or

threatened species violated the ESA. Western Watersheds begins by attacking the FWS's

definition of "threatened."   In addition, there is a question whether the FWS may take into

consideration conservation efforts that have not yet been implemented or have not yet

demonstrated that they are effective at the time of the listing decision, after the FWS has

evaluated the certainty of their implementation and the certainty of their effectiveness.  While

other courts have criticized an agency decision not to list a species when it relies on measures to

be implemented in the future, the FWS argues that the PECE policy was developed to address

those concerns.  Finally, the Western Watersheds asks the Court to decide whether the FWS

improperly based its decision to withdraw its proposed rule for listing slickspot peppergrass as

endangered because of political pressure rather than on the "best available science."

**A. Definition of "Threatened"**

**1. Foreseeable Future**

Western Watersheds contends that Defendants violated the ESA when the FWS

determined that a 82 percent chance of extinction in a 100 years or less, or with full

implementation of the CCA, a 64 percent chance of extinction, lies beyond the "foreseeable future," and, thus, does not meed the statutory definition of "threatened. Under the ESA, a species is "endangered" if it is in "danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and a species is "threatened" if it is "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

The ESA does not define the term "foreseeable future" and the FWS has not promulgated any rules or regulations setting quantitative thresholds to define the term. Nor did the FWS attempt to define "foreseeable future" in the context of the slickspot peppergrass except by negative implication, i.e., 64 percent chance of extinction in the 100 years with full implementation of conservation agreement. Based on this information, the FWS concluded that the conservation efforts would "reduce the expected decline in [slickspot peppergrass] over the next few decades to the extent that the species is not likely to become endangered in the foreseeable future." AR 34774.

The Court finds the FWS's conclusion untenable. The *Merriam-Webster's Dictionary of Law* defines "foreseeable" as "such as reasonably can or should be anticipated: such that a person of ordinary prudence would expect it to occur or exist under the circumstances." *Merriam-Webster's Dictionary of Law* (1996), *at* http://dictionary.reference.com/search. Yet, Federal Defendants suggest that a prudent person would not reasonably expect that extinction of the slickspot peppergrass would be complete within 100 years when the evidence suggests that a 64 percent chance exists that it will occur even assuming the full and effective implementation of the CCA. This conclusion defies common sense and the FWS own experts' conclusions and recommendations. Simply because some conservation efforts prolong the inevitable by a mere

twenty-years, does not reasonably push the "projected time when the species has a high risk of extinction[5] to beyond the foreseeable future," as the FWS suggests.  AR 34774 ("Efforts undertaken in the conservation agreement lower the risk of loss of individual sites over the short term, and delay complete conversion of the shrub-steppe ecosystem to annual grasses and subsequent loss of [slickspot peppergrass] (risk assessment indicated a delay of 20 or more years)")(Draft Panel Facilitation Summary).

The FWS own experts recommended that the time frame the panel should have considered with respect to "foreseeable future" was 60 to 100 years. AR 31056.  In the Draft Panel Facilitation Team Summary, the FWS managers characterized 0-20 years as representing the "near future" and the last two time intervals, 100 years to infinity, as "arguably" representing "a rather distant future." AR 34774.  By the FWS's own terms, the "foreseeable future" would have to lie somewhere between 20 years and 100 years.

Furthermore, other agencies and organizations, have designated much lower extinction risk within 100 years as qualifying a species for a "threatened" status.  For example, in this case, the FWS  rejected the timeframes suggested by the International Union for the Conservation of Nature ("IUCN"), which places a 10% extinction risk within 100 years as falling within the definition of "threatened." AR 31903.  In fact, in its own notes, the FWS acknowledged that its definition of "foreseeable future" and "threatened" differed from that of IUCN and observed that it would have to explain why it used a different standard.  *Id.*  The Court could not glean from the expansive administrative record where the FWS explained this deviation from IUCN guidelines for extinction risk.  In yet another case, a court classified a 1-

---

[5]Western Watersheds point out that the statutory definition does not talk about a "high" risk of extinction and that by this as the standard, the FWS has raised the threshold bar higher than Congress intended.  The Court will address this argument in a subsequent portion of the decision.

5% chance of extinction in 100 years as creating a discernable risk of extinction. *See Center for Biological Diversity v. Lohn,* 296 F.Supp.2d 1223,1232 (W.D. Wash. 2003)(noting that a group of scientists convened by NMFS recently recommended that a 1% probability of extinction in 100 years could meet the "conservation status" element of the DPS Policy for purposes of defining a species or population as endangered).

While these standards for assessing extinction risk, which were made in the context of other species and by other agencies or organizations, are not dispositive, they are certainly instructive. Nonetheless, Federal Defendants respond that because the term "foreseeable future" is an ambiguous term not defined in the ESA, the FWS's interpretations is entitled to *Chevron* deference. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843-44 (1984). Federal Defendants further argue that the term "foreseeable future" must be defined on a case-by-case basis because it is impossible to apply a uniform definition of "foreseeable future" due to the wide variations that occur between different species.

The Court is mindful of Federal Defendants' arguments and recognizes that the definition of "foreseeable future" may vary depending on the particular species–for example, "foreseeable future" may be defined differently for a sequoia tree (the National Park Service indicates an age of 3,200 years for a mature tree) than for the slickspot peppergrass, which is an annual or biennial plant. In recognizing this variance among species, the Court is not attempting to establish a bright-line rule for defining foreseeable future.

Yet, the agency making the decision, must "'articulate a satisfactory explanation' " for their action to permit effective judicial review," which the FWS has failed to do in this case. *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1525 (9th Cir. 1995) (quoting *Northwest Motorcycle Ass'n v. United States Dep't of Agriculture*, 18 F.3d 1468, 1478 (9th Cir. 1994).

The FWS divided the listing process into two distinct phases, biological "risk assessment" and "risk management", and specifically instructed the Science Panel <u>not</u> to reach a conclusion as to whether they believed slickspot peppergrass would likely become extinct in the foreseeable future.[6]  The only opinion which the expert panel rendered as to whether slickspot peppergrass was likely to become endangered in the foreseeable future was that the conservation measures "shifted the extinction risk further into the future relative to current management practices." The Science Panel never explained the implications of this rather vague assertion.  AR 32199.

Instead, this decision was left to the FWS managers during the "risk management phase" of the two-step process, during which the FWS managers "discussed the extinction risk threshold concept and contemplated, but did not endorse thresholds used or considered by other agencies and organizations."  Rather, the FWS applied more "general and qualitative terms" to conclude that the conservation efforts postponed beyond the foreseeable future the projected time when the slickspot peppergrass has a high risk of extinction.[7]  Yet, FWS managers never identified what sort of  "general and qualitative terms"  upon which they relied to define "foreseeable future."  They did not do so in their Panel Facilitation Summary, and, while extensive notes were taken throughout the Science Panel's discussion of extinction risk, FWS managers failed to take any notes during the "risk management phase." AR 32199. [8]

---

[6]"Panel only gave their explicit determination of Risk Analysis on Probability of Extinction to Managers who did Risk Mgmt.—Steve [Morey] kept these 2 processes <u>very</u> separate" (emphasis in original)(Steering Committee Notes from November 10, 2003, with handwritten notes).

[7]FWS's managers drew a total of fourteen (14) conclusions in deciding to withdraw the proposed rule to list slickspot peppergrass.

[8] The Court is disturbed that when the critical meeting on "risk management" was conducted, the FWS's decision makers were instructed that no personal notes of the meeting were to be taken.  (Steering Committee Notes from November 10, 2003, with handwritten notes) ("There was a NoteTaker that took notes all through the panel...[h]owever there was no notes taken during the FWS Managers ["risk management"] meeting on Friday.)

When pressed at oral argument to identify which general and qualitative criteria the FWS used in determining that slickspot peppergrass was not likely to become endangered in the foreseeable future, counsel could only point to the dormant seed bank and the life-cycle of the plant as additional factors which the FWS considered.  However, presumably, as the record demonstrates, the Science Panel took into account all the plant's characteristics when they conducted their assessment of extinction risk.  Federal Defendants ask the Court to assume that FWS's managers had a special insight into slickspot peppergrass, which its panel of experts did not possess.

If the Court accepted the FWS's approach as to how it may define a term such as foreseeable future, then the FWS could simply convene an expert panel to assess the extinction risk without developing criteria to interpret the information, thereby allowing the FWS managers, during the separate "risk management phase," to have free reign to define foreseeable future without any guidelines, or any means of reviewing its decision.  If the FWS had outlined in detail which quantitative and general factors it considered in its decision to withdraw it proposed rule, rather than merely relying on conclusory statements to justify its decision, then perhaps the Court would not so readily dismiss the FWS's conclusions.

However, under the particular facts of this case, the Court finds that the FWS acted arbitrarily and capriciously when it concluded that a 64 percent chance of extinction within the next 0-100 years did not meet the statutory definition of "threatened."  A mere statement that the conservation agreement "will postpone the projected time when the species has a high risk of extinction to beyond the foreseeable future," without first delineating how the FWS managers defined foreseeable future, does not suffice–especially when the conclusion

contradicts the recommendation of its own expert, the IUCN, and the conclusions of other

scientists who have assessed the gravity of a particular extinction risk in other cases.

### 2. High Risk of Extinction

The FWS also violates the ESA in requiring a "high risk of extinction" before deciding

to list slickspot peppergrass as threatened.  A species meets the statutory definition of

"endangered" if it is in "danger of extinction throughout all or a significant portion of its

range,"  16 U.S.C. § 1532(6), and a species is considered "threatened" if "it  is likely to become

endangered throughout all or a significant portion of its range." 16 U.S.C. § 1532(20)(emphasis

added).  In other words, for a species to be listed as "threatened" it must only be likely to be in

danger of extinction in the foreseeable future.  By using the standard, "high risk of extinction"

in the "foreseeable future," the FWS conflates the terms "endangered" and "threatened," and

creates a higher standard for a "threatened" species than Congress intended.  This

misapprehension of the term "likely to become endangered" further warrants the reversal of the

FWS's decision to withdraw its proposed rule for slickspot peppergrass.

### B. PECE Policy

Assuming the newly-minted conservation efforts would push the risk of extinction

beyond the foreseeable future, Western Watersheds also argues that the the FWS improperly

applied the PECE policy to effectively circumvent much of the relevant case law in the Ninth

Circuit, as well as some other circuits throughout the country, which have rejected attempts by

agencies to rely on unproven and speculative conservation measures to preclude the listing of a

species under the ESA .  *See Defender of Wildlife v. Norton,* 258 F.3d 1136 (9th Cir. 2001);

*Federation of Fly Fishers v. Daley*, 131 F.supp.2d 1158 (N.D. Cal. 2000); *Oregon Nautral*

*Resources Council v. Daley,* 6 F.Supp.2d 1139 (D.Or. 1998); *Save Our Springs v. Babbitt*, 27

F.Supp.22d 739 (W.D. Tex. 1997); *Biodiversity Legal Foundation v. Babbitt,* 943 F.Supp. 23 (D.D.C. 1996).

The Court understands from the parties that this is the first time the FWS has applied the PECE policy when making a listing determination.  Therefore, this is a question of first impression.  However, having already decided Federal Defendants violated in the ESA based on its misapplication of the term "foreseeable future" and its creation of a new standard, "high risk of extinction," the Court does not find it necessary to address this issue.  Nor does the Court find it necessary to address Western Watersheds' contention that the FWS improperly allowed political considerations to influence its decision to withdraw its proposed rule for listing the slickspot peppergrass as endangered.  These are issues which presently do not bear on the disposition of this case and need not be discussed at this time.

However, it should be noted that the Court does not want to discourage or undermine conservation agreements undertaken outside the auspices of the ESA.  The Court commends the efforts and hard work undertaken by the many different parties involved in developing the Candidate Conservation Agreement for the slickspot peppergrass.  Such efforts are laudable and can be very effective in arresting the decline of a species in need of monitoring.  At a minimum, it would seem that an appropriate time for the implementation of such agreements would be when a species is first designated as a category 2 candidate species, which warrants careful monitoring, or even sooner.  As this case demonstrates, formalized conservation efforts should be implemented before a species stands so near the precipice of extinction.  The Court hopes the federal and state agencies and various private groups continue to work cooperatively to conserve the slickspot peppergrass within the mandate of the ESA, and the CCA can serve as a solid foundation upon which to build additional protection provided by the ESA.

**IV.**
**Conclusion**

For the foregoing reasons, the Court concludes that the FWS's decision to withdraw the proposed rule recommending the slickspot peppergrass for ESA protection was arbitrary and capricious.  Although a reasonably expansive conservation agreement had just been signed before the FWS made the decision to withdraw its proposed rule, the FWS should have erred on the side of caution, when the best available scientific data indicated that extinction of the slickspot peppergrass was likely to be complete within the next 100 years, rather than placing "the risk of failure squarely on the species."  *See Oregon Natural Resources Council v. Daley,* 6 F.Supp.2d 1139, 1161.

The Court therefore REVERSES the decision to withdraw the proposed rule, with directions that the case be remanded to the Secretary of the Department of Interior for reconsideration in accordance with the legal standards outlined in this opinion, the question whether a proposed rule listing the slickspot peppergrass as either threatened or endangered should be adopted.

**<u>ORDER</u>**

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that**:

1) Plaintiff's Motion for Summary Judgment (Docket No. 26), filed on November 8, 2004, is GRANTED.

2) Federal Defendants' Cross-Motion for Summary Judgment (Docket No. 40), filed on January 21, 2005, is DENIED.

3) Motion for Summary Judgment by Defendant-Intervenors Governor Dirk

Kempthorne, *et al.* (Docket No. 48), filed on January 25, 2005, is DENIED.

2) Defendants' Motion to Strike the Second Declaration of Todd C. Tucci (Docket No.

74), filed on July 28, 2005, is denied as MOOT.


DATED: August 19, 2005

_____
Honorable Mikel H. Williams
United States Magistrate Judge